Filed 6/18/14  P. v. Gonzalez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056554 |
| v. | (Super.Ct.No. FVA901232) |
| HORACIO GONZALEZ, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Arthur Harrison, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Horacio Gonzalez, Jr., guilty of one count of murder in the first degree (Pen. Code, §187, subd. (a)),[1] with the additional allegation of the use of a deadly weapon (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)). Defendant was sentenced to 25 years to life for the murder, with a consecutive one-year term for the weapon's use.

Defendant raises five issues on appeal. First, he asserts that there was insufficient evidence to support a finding that the murder was premeditated. Next, he argues that counsel rendered deficient representation by failing to request a pinpoint instruction on provocation and also by failing to make an offer of proof concerning defendant's GPS logs of the victim's travels. The fourth issue charges that the trial court improperly pressured a deadlocked jury to reach a verdict. Fifth, defendant asserts that the cumulative prejudicial effect of trial errors requires reversal. Finding none of these contentions persuasive, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Defendant and the victim met in 2003; they were married in 2006 and had two children. In 2006, the marriage began to change, and the couple began to fight. Defendant would yell, curse, and spit. The couple separated in early 2009. The victim moved in with her sister, but there were continued incidents. Defendant threw a rock at the victim's car and threatened to kill himself, tying a belt around his neck. He was held for two days for psychiatric observation as a result. Some altercations were

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

physical, with the victim receiving scratches, bruises, and injury to her neck. The victim obtained a restraining order against defendant, barring him from contact with her, which he repeatedly violated. Incidents would occur when defendant and the victim crossed paths as part of child visitation.

Defendant was possessive about the victim. After their separation defendant became morose and lost weight. He was fired from his job in the mortgage business. He asked a friend to wire a GPS locator to the victim's car, but the friend refused. Defendant attached the GPS, and used it and a private investigator to monitor the victim's movements. Defendant received tracking information every three minutes. Defendant kept the information from the GPS locator on a laptop computer.

Defendant believed the victim was becoming romantically involved with a friend of hers, Ebrat Sakhaeifar; on July 21 defendant vandalized Sakhaeifar's car when he saw Sakhaeifar and the victim at a restaurant with a group of friends. The next day, defendant contacted Sakhaeifar and demanded to know if Sakhaeifar was having sex with the victim. Defendant, "could care less what [the victim] was doing," but he was worried that Sakhaeifar would raise his children. Sakhaeifar had once been convicted of loitering with intent to commit prostitution.

Defendant's former coworker, Diana Lozano, had given defendant a machete after defendant told her his property had been tagged with graffiti. On July 22, 2009, the day after defendant vandalized Sakhaeifar's car, defendant told his manager that he felt unwell and left work early. He had already talked on the phone three times with Lozano. Defendant called Sakhaeifar from his car and had an angry conversation with

3

him.  Defendant then called and texted the victim; he was seeking more visitation time with his kids.  He "was done" after that phone call and "[i]t wasn't worth living . . . ."  Defendant went to the beauty salon where the victim worked, and he brought with him a gas can, a laptop computer, and the machete.  Defendant went to the salon "to discuss possible increased visitation" with the victim.  He brought the laptop to show her the tracking information he had, which he intended to threaten to show to the court if the victim did not give him increased visitation.  He brought the machete, which he had "[i]n [his] car from the night before" when he vandalized Sakhaeifar's car.  Defendant intended to use the machete for "[i]ntimidation."  In the laptop bag was a 24-ounce bottle of bleach, which he brought to use to kill himself.[2]

When defendant arrived at the salon, he entered, yelling "Where's [the victim]?" or "Where is she at?"  His entrance created a stir; he was described as looking "very" angry, "very determine[d], demented," "kind of crazy looking," with "an evilness in his eyes," "evil-looking," and "[d]emonic" but not "crazy."  People in the salon screamed and scattered, and some ran to warn the victim, who ran out the back door.  Defendant raised the machete as he ran towards the back.  Defendant stumbled or was tripped when he reached the rear of the shop, and he dropped the gas can and his bag.  He pursued the victim into the parking lot behind the salon.  Defendant caught up to the victim and they both fell.  The victim got up and started to run towards the back door of the salon, but defendant got between her and the door and "pushed her" away from the

---

[2] We found no testimony regarding the gas can, its contents, or its purpose.

salon.  He then struck her with the machete, with the most serious blow inflicting a deep cut to the side of her head and neck.  Defendant threw the machete on the ground by the victim and left the scene.  Despite attempts to help her, the victim bled to death in the parking lot.

Defendant walked away to go drink bleach.  He bought a 24-ounce bottle of bleach, which was the same size as the one he left at the salon in his laptop bag.  He walked approximately one mile from the salon.  Lozano called defendant's cell phone during that time; defendant was curt and hung up on her.  When Lozano called back he was crying, throwing up, and saying "'she's gone.'"  Approximately 20 minutes after his attack on the victim, defendant texted Lozano to come pick him up.  He would not tell her exactly where he was, but she pieced it together from information from him and his mother.  When located, he was sitting against a tree, drinking bleach.  Lozano tried to get the bottle away from him, but he would not give it up and continued to drink from it.  Lozano called 911.  Lozano's friend flagged down a police car.  The officer saw that defendant matched the description of the suspect being sought for the attack at the salon and arrested him.  He noted blood on defendant's lips and bleach stains on his pants.

The autopsy performed on the victim revealed the fatal blow had fractured the victim's skull and severed her left carotid artery and both the left internal and external jugular veins.  There were three superficial linear injuries that could have been inflicted by the blunt side of the machete.  Part of the victim's thumb was severed; this was likely a defensive wound.  Apart from the head and thumb wounds, all the other injuries were superficial.

5

The defense elicited testimony from two medical experts. Dr. Vasilica Valcu, a psychiatrist, testified he initially examined defendant on September 29, 2009, two months after the killing, and found him to be suffering from major depressive disorder. Defendant initially told Dr. Valcu that he was having auditory hallucinations, but these went away. Dr. Valcu had no opinion of defendant's mental state at the time of the murder. Forensic psychologist Dr. Michael Kania testified that he ran the MMPI (Minnesota Multiphasic Personality Inventory) test on defendant and found defendant suffered from paranoid distortions and severe delusions, with depression that dated back to January 2009. Dr. Kania characterized the results of the MMPI as having "borderline validity" because of some "mild" exaggeration and possible thought disorders, but he saw no evidence of malingering. Dr. Kania did not meet with defendant until November 2011, but did not believe that his diagnosis was less reliable because of the passage of time. Dr. Kania's diagnosis of defendant was depression with suggestions of psychotic thinking.

Defendant testified at trial. Before he testified, the trial judge found it necessary to make a record of defendant's behavior during Sakhaeifar's testimony. Outside the presence of the jury, the judge noted there was the start of an "outburst" by defendant, where he became angry and started to rise from his seat. The bailiff put his hand on defendant to calm him. The court also noted defendant was responding vocally and by gesture to Sakhaeifar's testimony and, "You could tell he was angry."

Defendant testified his marriage degenerated when the victim became "neglectful as a wife to [him]," despite the fact that he would give her "permission" to go out with

6

friends as a sort of reward for giving him two beautiful children and being a good wife. Defendant felt he was not "controlling." He was disturbed when the victim would stay out until 9 p.m. on weeknights after work, once coming home at 11:45. He denied being jealous about the victim or abusive towards her. Although the night before the murder he vandalized Sakhaeifar's vehicle, he testified "I don't see why" he would be jealous of Sakhaeifar. After January of 2009 he "gave up" on the victim and "just moved on with [his] life"; his concern was only for his children. Defendant tracked the victim's movements because he was concerned she was not spending enough time with the children.

The tracking log defendant kept on the victim was not permitted to go before the jury. It contained information about where the victim's car went and how long it stayed in various places. Defendant made entries in the log regarding information he had received from the detective he had hired to follow the victim, and information he obtained about the locations she visited. Defendant would note when the victim visited the homes of men and their ages, when she made deposits to her bank account, his suspicions about drug use at certain locations, and when she stopped at locations near nightclubs or strip clubs. One entry contained the notation, "CHUCKIE CHEESE PIZZA GOOD QUALITY TIME WITH MOTHER." The notations in the proffered tracking records suggest that the victim may have been working as a prostitute and frequenting strip bars. The log became garbled and indecipherable. Defendant testified he was "scared" about the places the victim went.

7

Defendant lost custody and visitation with the children partly because of the incidents that occurred when he would meet the victim for visits. Nonetheless, he maintained that his children were his highest priority. He testified he accepted the machete after his property was tagged—not for his own protection, but because he was concerned about being able to protect his home if he was awarded custody of his children. Defendant felt "[the victim] could date who she wanted," but that she forgot about their children.

Defendant went to the salon on the day of the attack to show the victim the tracking logs on his computer, but he also brought a machete, a gas can, and a bottle of bleach. He denied raising the machete that he carried. He had the laptop bag and gas can with him in the parking lot. Defendant purchased a second bottle of bleach to drink after the murder. Defendant testified that when he struck the victim in the head with the machete, he did not intend to kill her, but admitted telling a psychologist that when he was pursuing the victim he felt "like a lion chasing a zebra."

Defendant sparred with the prosecutor while on the stand. He told her she did not know the facts. He deflected her questions with non-answers such as "That's your opinion, yes," "I can give you that," "Those are your words," and "Is that a statement or question, ma'am?" He responded to defense counsel's objection to a question about whether a person striking someone in the head with a machete would be intending to kill with, "I have an answer. That's fine," "I have an answer. I'm not worried." He stated that a person "in their right mind" would "absolutely" intend that, but he had denied that he intended to kill the victim.

During the trial, defense counsel sought a jury instruction on voluntary manslaughter. The defense argued the GPS logs, which tracked the victim's car, were evidence of provocation by her misbehavior sufficient to affect the defendant's reasoning and judgment. In addition, the defense argued that the testimony of the two expert witnesses would support a defense of diminished actuality. The trial court did not admit the tracking logs into evidence because they were purely conjectural; they provided no information about what was done at any given location or even who was using the car. The manslaughter instruction was not given because the trial judge did not believe there was "anything that the decedent did that could reasonably be construed to cause the provocation for the heat of passion that might be a defense in this case." Defense counsel registered a continuing objection to the denial of the instruction. The court backtracked, noting, "[b]ased on what your defendant might testify to, I think you might be able to try that, put it that way." After the completion of testimony, the trial judge reconsidered and reaffirmed his ruling.

The jury received the case on May 17, 2012, and deliberated for two hours until the proceedings were continued to May 21. On May 22 the jury sent a note asking "[t]o see the judge. We can't make a decision." Before the court responded, the jury then asked for Dr. Kania's testimony to be read back. The trial judge delivered, orally and in writing, a further instruction. The jury received a read-back of Dr. Kania's testimony, and reached a unanimous verdict the next morning, after less than two hours of further deliberation.

9

# DISCUSSION

## A.    SUFFICIENCY OF EVIDENCE OF PREMEDITATION

Defendant asserts that his conviction is invalid because there is insufficient evidence that the murder was premeditated.  In determining whether a criminal conviction is supported by sufficient evidence, a reviewing court must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318, fn. omitted.)  In *Jackson*, the Supreme Court explained, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Id.* at pp. 319, fn. omitted; see also *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  The judgment challenged on appeal is presumed correct, and it is defendant's burden to affirmatively demonstrate error.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  We cannot substitute our judgment for that of the jury, even if we believe the circumstances might also support a contrary finding.  (*People v. Gonzales* (2011) 52 Cal.4th 254, 295, citing *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

10

Substantial evidence is evidence that "maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) To be substantial, evidence must be credible and of solid value. (*People v. Guardado* (1995) 40 Cal.App.4th 757, 760-761.) The "whole record" to be reviewed includes "the entire picture of the defendant put before the jury" and is not limited "to isolated bits of evidence selected by [one party]." (*People v. Johnson*, *supra*, 26 Cal.3d at p. 577.) Given this court's limited role on appeal, defendant bears a heavy burden in claiming there was insufficient evidence to sustain his conviction for first degree murder.

Deliberation "'means careful consideration and examination of the reasons for and against a choice or measure.' [Citation.]" (*People v. Bender* (1945) 27 Cal.2d 164, 183.) Premeditation "means 'To think on, and revolve in the mind, beforehand; to contrive and design previously.' [Citation.]" (*Ibid*.) Relying on the *Thomas* court's emphasis on reflection, the court concluded that "'[t]he true test is not the duration of time as much as it is the extent of the reflection.'" (*Bender*, at p. 185, quoting *People v. Thomas* (1945) 25 Cal.2d 880, 900.) Thus, "'[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) In response, our state Supreme Court reaffirmed the significance of "preexisting reflection, of any duration" to distinguish first degree murder (based on premeditation and deliberation) from second degree murder. (*People v. Solomon* (2010) 49 Cal.4th 792, 813; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

11

The court in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), provided guidelines "for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation." (*Id*. at p. 26.) Such evidence "falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at pp. 26-27.) The categories are neither complete nor exclusive. (*People v. Koontz* (2002) 27 Cal4th 1041, 1081.) "Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight. [Citations.]" (*People v.*

*Halvorsen* (2007) 42 Cal.4th 379, 419-420.) "However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' [Citation.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Illustrating evidence of planning, *Anderson* discussed the case of *People v. Hillery* (1965) 62 Cal.2d 692, in which "the defendant's surreptitious conduct, subjection of his victim to his complete control, and carrying off of his victim to a place where others were unlikely to intrude, can be described as 'planning' activity directly related to the killing." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) In another case, planning evidence was found when the defendant left the victims to retrieve a rifle from his car and, after killing one victim, manually loaded a second shot into the rifle's chamber to kill the second victim. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) Similar evidence was present in *People v. Young* (2005) 34 Cal.4th 1149, where the defendant, after being denied entry to a house, crashed through a living room window armed with a gun before killing a resident inside the house. From such evidence, the jury could infer that the "defendant 'considered the possibility of murder in advance' . . . ." (*Id.* at p. 1183.)

Here, the circumstances of the present incident are clearly susceptible to a reasonable inference that defendant's conduct was the result of preexisting reflection as opposed to a rash unconsidered impulse. Substantial evidence of all three *Anderson* factors—planning, motive, and a method of killing tending to show a preconceived plan—can be drawn from defendant's actions.

Defendant's challenge to his conviction rests on comparisons with other first degree murders. Unlike the cited cases, his crime was not "surreptitious or calculated."

13

Further, he notes that his crime took place in daylight before a group of people who could easily identify him, and he inflicted a number of superficial wounds before the killing blow. Such a killing must have been an impulsive act by a man debilitated by depression, he asserts, because there were other ways to kill her that were more covert or efficient. Since this proves his crime was not planned, he argues that premeditation can only be found here under *Anderson* if there is evidence of motive and evidence that the manner of killing showed a preconceived design. The fact that defendant argued with and was physically abusive of the victim does not establish motive, and, in his view, the manner of killing is "as consistent with a sudden, random explosion of violence as with calculated murder." Unlike an execution-style shooting, the most calculated type of murder, the frenzied machete-slaying here is "entirely *inconsistent*" with premeditation, he says, and his attempt to kill himself afterwards shows that he was acting rashly and impulsively. Defendant compiles his argument by reference to isolated parts of the record; consideration of the full record refutes his assertions.

There is no requirement in the law that a defendant's planning must intend the most optimal crime. Premeditation is shown when a defendant arrives at the scene of the crime with a plan for a murder, regardless of whether it comprises the best or most complete scenario. Activity "directed toward" and "explicable as intended to result in[] the killing" is all that *Anderson* requires. (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.) The record shows such activity.

Defendant saw the victim with another man and the next day, he decided he did not want to live any more. He walked into the salon where the victim worked carrying

his makeshift murder/suicide kit. He brought a laptop computer, a machete, a gas can, and a 24-ounce bottle of bleach. His testimony was that he brought the laptop to show the victim that he had evidence she was an unfit mother, and have a conversation regarding visitation with their children. The jury may have believed this, although it is unlikely that yet another violation of the restraining order against him would lead a judge to rule in his favor. He testified that he only brought the machete to get her to listen to him, for "Intimidation." The jury might have believed this as well, but to do so they would have had to discount the testimony heard from other witnesses that he raised the machete in his hand as he stormed down the aisle of the salon. The jury could believe that the machete just happened to be at hand, but to do so they would have to disregard defendant's testimony that the weapon, which he said he kept to defend his property from taggers, was in his car "from the night before," when he saw Sakhaeifar with the victim, and vandalized Sakhaeifar's car. The jury could have accepted that the machete was for protection or intimidation, and not for lethal violence. However, it cannot be said that *no rational fact finder* would reach the opposite conclusions, given the difficulties with defendant's testimony.

Defendant did not explain why he brought the gas can or the bleach into the salon. He did state that, after he attacked the victim, he left "to go drink [his] bleach." He testified he was already suicidal when he arrived at the salon and life "wasn't worth living." He bought the bleach beforehand and had it in his laptop bag. Clearly, defendant had a plan to kill himself after the confrontation at the salon, or at least to make it look like he was trying to do so.

15

It is possible a jury could believe that defendant expected his scheme, to obtain greater visitation rights, would fail, and he would then kill himself. However, it is not unreasonable for the jury to believe defendant instead planned to kill himself after committing a murder in broad daylight, in front of witnesses who knew him, and that this explained why his plot had no getaway plan. Further, such an end is entirely consistent with defendant's testimony about his suicidal ideation.

Defendant's plan can reasonably be seen as being focused on murder, and not on visitation. Witnesses testified defendant entered the salon in a rage, using terms such as very angry, demonic, evil, demented, and crazy-looking to describe his aspect. Defendant denied he was running or out of control as he entered the shop, but witnesses testified people screamed and scattered as he ran in. Defendant's initial anger, before any confrontation of the victim, is significant.

Defendant insisted he was not motivated by jealousy. He testified he had "moved on" after January of 2009 and "could care less what she was doing" with her personal life. He said "she could date who she wanted" and he was not jealous of other men. Defendant testified he tracked her movements by private detective and GPS tracking only because he was afraid she was neglecting her children. Although the tracking logs were not presented to the jury, they included the names and ages of males residing at the addresses where her car stopped. Clearly, it was possible the victim's travels were innocent; the jury could reasonably choose to view the evidence that defendant was tracking the victim's movements as proof not of his fatherly concern but of his obsessive jealousy. The fact that the murder occurred the day after defendant

16

vandalized Sakhaeifar's car, after defendant saw Sakhaeifar with the victim—defendant watched in his car with his machete—may have pressed a contrary view upon the jury. Further, the fact defendant stormed into the salon shortly after a conversation with Sakhaeifar, which defendant admitted made him "very angry"—one that Sakhaeifar reported began with defendant's question "Are you fucking my wife?"—makes it a reasonable conclusion by the jury that defendant's predominate issue was not child visitation.

As defendant chased after the victim, defendant stumbled at the rear of the shop. He insisted he did not drop his laptop bag and bleach bottle, but witnesses testified otherwise and the items were recovered in the salon by the police. Defendant had to purchase a second bottle of bleach after the murder, which would not have been necessary if he had not dropped the laptop bag in the salon. After he fell, defendant retained only the machete. If defendant's plan was to increase his visitation rights through blackmail and intimidation, he needed to have the laptop to show his "evidence." If his plan was to kill and then kill himself, he needed only the machete and the bleach. Defendant had and used the machete. Defendant and the victim fell together once as she tried to escape. He did not attempt to discuss visitation with her or reconsider his purpose after the fall. He testified he felt "like a lion chasing a zebra" as he closed in on the victim. Defendant herded her away from the salon's back door; he took the time to strike her three times with the blunt side of the machete, call her "bitch," and make a comment about not being allowed to see his kids, before he drove the machete blade through the side of her skull into her brain. The evidence supports

the view that defendant toyed with and taunted the victim before killing her, which is not at all inconsistent with premeditation.

Defendant's testimony was not inherently more believable than other evidence before the jury. His testimony that he retained the laptop bag after his fall in the salon was further undercut by his own testimony that after the killing he purchased another bottle of bleach to drink. The police recovered a bottle of bleach in the laptop bag at the scene of the murder; defendant felt the need to conform to his plan down to the last detail by drinking bleach, despite the fact that he had at hand a proved lethal weapon. Defendant's suicide attempt was planned, and not a rash or impulsive act. Further, just as the jury could find defendant planned his suicide attempt, it could reasonably find that he planned its failure. Defendant testified he came to the salon intending to die, but he ingested poison rather than immediately end his life by using the machete. He also walked over a mile away to find a place to sit. Although he testified that he intended to die, he answered calls on his cell phone, and, some 20 minutes after the murder, texted Lozano to come pick him up. Defendant also called his mother and told her where he was. When Lozano found him, he was still drinking from the same 24-ounce bottle, nearly an hour after the murder. Defendant denied that he drank the bleach to manipulate people to feel sorry for him, but that conclusion is no less supported by his claim that he intended to take his own life. Defendant's actions can reasonably be seen as preconceived and planned, arising from a jealous and controlling motive.

We must not substitute our views for those of the jury if there is substantial evidence to support its verdict. There is substantial evidence to support each *Anderson*

18

factor. Defendant's activity before arriving at the salon displays extensive planning behavior. He assembled a set of items, each of which had a purpose in his plan, including a lethal weapon. He was not at the salon by chance, but left work early to drive to the salon while calling the victim and her supposed paramour on his cell phone. Once at the salon, he chased her out of the shop with the only item indispensible to his plan: the machete. His motive, as well, is clear. Rather than his unlikely tale of a clumsy attempt to win increased visitation with his children, the jury chose to accept the prosecution's description of a jealous estranged husband who, after seeing his wife with another man, decided to end her life.

Lastly, the manner of the killing meets the third *Anderson* standard and supports the jury's finding of premeditation. Defendant ran through the salon to chase the victim into the parking lot; he thought of himself as a hunting lion. In addition to that reflection, defendant had a further opportunity to abandon his killing purpose when they both fell, but he resumed his chase. The victim got to her feet and tried to reach the safety of the salon, but defendant blocked her and pushed her away from the back door. Eventually, the victim "just stood there. She stopped fighting. And she just was trying to block him with her hand[s] like an X." "The one wound that would be classified as defensive is the injury to the thumb. It's likely she was trying to cover her head and the thumb was severed when the injury to the head took place. . . . [¶] . . . [¶] [D]efensive type are injuries on the hands and forearms where you're essentially trying to cover and protect yourself." In *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102, the victim's effort to retreat, posing no threat, evidenced premeditation and deliberation by the killer.

19

Defendant said his purpose was to show the victim the evidence he had against her on the laptop, but he had dropped the laptop in the salon. Without the laptop to prove his knowledge of her unworthiness as a wife and mother, he settled for slapping her with the blunt edge of the machete, insulting her, and telling her that she was to blame for his acts. Then defendant killed the victim with a single blow to the head, dropped the machete by her body, and walked away. Finding strong evidence of planning and supporting evidence for all three of the *Anderson* guidelines, we find substantial evidence in support of the jury's verdict.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts his counsel rendered constitutionally inadequate assistance by failing to request a pinpoint instruction that defendant's subjective mental state was such that he did not deliberate and premeditate the murder. As a companion issue, he charges that his counsel was also derelict in failing to make an offer of proof that the tracking records should be admitted as demonstrating his subjective state of mind. Finding no possible prejudice from the failure to attempt these acts, we affirm the judgment.

To establish constitutionally inadequate performance by counsel, defendant must show, "(1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to undermine confidence in

20

the outcome. [Citations.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among other cases, *Strickland v. Washington* (1984) 466 U.S. 668; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 430.) Hence, any such claim has two necessary parts: deficient performance and prejudice to the defense. (*Strickland*, at pp. 687-688, 693-694; *People v. Williams* (1997) 16 Cal.4th 153, 214-215; *People v. Davis* (1995) 10 Cal.4th 463, 503; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) If defendant fails to establish either component, his claim fails.

### 1. *PINPOINT INSTRUCTION*

The jury received three instructions regarding murder. They were given the standard definition of murder in CALCRIM No. 520. CALCRIM No. 521 correctly instructed the jury on the difference between first and second degree murder. The instruction states that, in order to determine the defendant premeditated and deliberated, the jury must find that the defendant "carefully weighed the considerations for and against [his] choice and, knowing the consequences, decided to kill." It further explains that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

The jury also received instruction CALCRIM No. 522, "Provocation: Effect on Degree of Murder." The instruction reads: "Provocation may reduce a murder from first degree to second degree[.] The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

21

Defendant argues that his counsel should have requested a pinpoint instruction that "amplified" CALCRIM No. 522 regarding his subjective mental state.

CALCRIM No. 522 is itself a pinpoint instruction. (CALCRIM, Bench Notes, p. 250.) It modifies the standard definition of murder in CALCRIM No. 520 and of degrees of murder set out in CALCRIM No. 521. The instruction has been upheld as sufficiently distinguishing between first degree murder and second degree murder on the basis of provocation. (*People v. Hernandez* (2010) 183 Cal.App.6th 1327, 1334.)

Subjective provocation sufficient to reduce first degree murder to second degree murder requires that defendant's mental state was such that he did not deliberate and premeditate the killing. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296; *People v. Padilla* (2002) 103 Cal.App.4th 675, 677-678.) A defendant who does not deliberate and premeditate due to provocation is guilty of second degree murder even if the provocation would not have prevented a reasonable person from deliberation or premeditation. (*Fitzpatrick*, at pp. 1294-1296.) Such a subjective mental state exists when a defendant "formed the intent to kill as a direct response to . . . provocation and . . . acted immediately." (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

The subjective provocation upon which defendant relies arose "from depression so severe that it bordered on paranoid delusions affecting his decision-making capabilities." He argues in briefing that the victim's activities scared him for the welfare of his children, so he sought to "convince her through intimidation to allow him to see his children or run the risk he would use the information in family law court."

22

Because he testified that he never intended to kill, he asserts that he acted without "making any calculated judgment or weighing considerations." Further, Dr. Kania, his psychologist, testified that defendant suffered from chronic depression with schizophrenic reactions and paranoid features. However, the diagnosis came from the doctor's evaluation of him in 2011, which he could "date back" to 2009 based upon records of other doctors that he reviewed. Dr. Kania's diagnosis was depression with "strong suggestions as to the possibility of psychotic thinking, even at that time and indication of similar thinking as he told me about what he recalled happening in July of 2009." Defendant acknowledges that there was no actual provocation by the victim, but states that it was defendant's "delusional belief based upon the GPS log[] evidence that [the victim] was not taking proper care of their children and he feared for their welfare, so much so that he went to the hair salon intend[ing] to confront her and use the log[] evidence in an attempt to see his children."

The fact that counsel did not request a further pinpoint instruction on subjective provocation did not render his representation deficient. "'[I]n appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . [b]ut a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) A pinpoint instruction on subjective provocation is required to be given only if it is requested and if there is evidence to support the theory.

23

(*People v. Rogers* (2006) 39 Cal.4th 826, 878)  Here, the instruction lacked sufficient supporting evidence.

Defendant asserts he was motivated by fear for his children's welfare.  For the purpose of this claim, he presumably admits this fear was objectively unreasonable and that his depression clouded his thinking so that he believed his fears were warranted.  Even granting defendant's claim to have suffered from delusions at the time of the killing—which rests on the extremely tenuous footing of psychological testimony based upon a MMPI test administered 30 months after the killing, self-reporting of past symptoms, and extrapolation from more contemporaneous medical reports—a necessary connection is missing.

Nothing about the supposed subjective provocation would lead defendant to murder.  At most, defendant has explained why he might have thought he must violate his restraining order to attempt to blackmail the victim to let him see their children more often.  There is no provocation to murder.  Defendant has not argued that he killed his children's mother in order to protect them from her bad parenting.  The victim did nothing to provoke defendant when he arrived at the salon.  All of the alleged provocations occurred beforehand, as did defendant's planning and deliberation.  Defendant has denied jealousy or possessiveness as motivations for the murder.  Although defendant states he was provoked to confront the victim over her neglect of their children, his action, upon sight of the victim, was to murder her.  Defendant unreasonably believed the victim was a bad mother and therefore wanted greater

24

custody of his children. Murder was not a consequent response. The evidence does not support giving a further pinpoint instruction.

Furthermore, the pinpoint instruction would have duplicated the instructions that were given. The trial court instructed the jury that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly." This instruction adequately covered the defense theory, and a duplicative pinpoint instruction need not be given. Most significantly, there was compelling evidence of premeditation and deliberation. Overwhelming evidence shows that defendant did not form the intent to kill "as a direct response to" provocation and did not kill "immediately." (*People v. Wickersham*, *supra*, 32 Cal.3d at p. 329.) We are convinced beyond a reasonable doubt that an instruction more explicitly applying a subjective standard would not have influenced the jury's verdict.

### 2.     *ADMISSION OF GPS TRACKING RECORDS*

Defendant asserts his counsel rendered him inadequate assistance because counsel failed to make an offer of proof that the GPS tracking records were relevant evidence to defendant's state of mind. Because the records were not relevant to any issue at trial, we find that the offer of proof would have been a futile gesture and defendant therefore suffered no possible prejudice.

A trial court has broad discretion in determining the relevance of evidence but lacks discretion to admit irrelevant evidence. (*People v. Riggs* (2008) 44 Cal.4th 248, 289.) Here, the trial court received oral argument on the admission of the tracking logs,

25

took a break in the proceedings to review them, found them inadmissible and stated its reasons: all on the record. Defendant told the court the tracking logs provided information as to when the tracked vehicle arrived at specific addresses, but the court noted that many entries consisted of specific addresses and an "mph" entry, indicating the car was moving. The reliability of the logs was further undercut by the fact that they do not record who was driving the vehicle, so their relevance to the victim's activities is suspect. Defendant's briefing does not respond to the trial court's concerns. Instead, defendant maintains the logs would have provided evidence of defendant's delusional state of mind—despite their flaws.

This court has reviewed the proposed evidence and finds it was not an abuse of discretion to exclude them. Defendant's obsessiveness was already before the jurors: they knew he hired a private detective to follow the victim and that he surreptitiously attached a GPS tracker to her car, which reported her location to him every three minutes. The only additional information the records themselves would provide come from comments inserted by defendant into the tracking records. The narratives added to some entries disparaged the victim and accused her of promiscuity, drug use, and prostitution. The records are duplicative in places. As the facts of defendant's monitoring of the victim were already before the jury, the only additional value of the logs would be allowing defendant to voice his accusations against the victim. That does not justify their admission, and they were properly excluded.

Despite the adverse ruling, no offer of proof was required of counsel. The trial judge excluded the logs and explained his reasoning on the record. Defendant asserts

26

that the failure to make a formal offer of proof was deficient performance. This overestimates the significance of an offer of proof. "An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.) The trial court considered the arguments before it and even took a break in the proceedings for further review and consideration following the initial argument. In addition, defense counsel then objected to the ruling and registered a continuing objection. There was no need to further highlight counsel's disagreement with the ruling. The trial court was well informed of counsel's arguments and no change or clarification would be forthcoming.

The record would not have been improved by an offer of proof. "The offer of proof exists for the benefit of the appellate court. The offer of proof serves to inform the appellate court of the nature of the evidence that the trial court refused to receive in evidence . . . . The function of an offer of proof is to lay an adequate record for appellate review . . . ." (1 Wigmore on Evidence, § 20a (Tillers Rev.1983), p. 858.) The proposed evidence was marked for retention and is before us. The trial court set out its reasoning in the trial transcript, and we have reviewed and accepted it. In everything but name, defense counsel made an offer of proof and he has preserved the issue for us in full. We see no possible prejudice from counsel's failure to make an offer of proof, and find no deficient performance.

C.    JURY DEADLOCK

The jury received the case on May 17, 2012.  On May 22 the jury sent a note indicating they could not reach a decision.  The trial judge delivered a further instruction derived from *People v. Moore* (2002) 96 Cal.app.4th 1105 (*Moore*).[3] Defendant argues that the *Moore* instruction used in response to the jury's note coerced the verdict.  Finding no impropriety in the decision to give the instruction and no defect in the instruction, we affirm.

Section 1140 provides, in pertinent part, that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict . . . unless by consent of both parties [or] at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The determination, pursuant to section 1140, whether there is a '"reasonable probability"' of agreement, rests within the sound discretion of the trial court. [Citation.]"  (*People v. Proctor* (1992) 4 Cal.4th 499, 539, citing *People v. Miller* (1990) 50 Cal.3d 954, 994; *People v. Breaux* (1991) 1 Cal.4th 281, 319.)  "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that

---

[3] The *Moore* instruction is given to a deadlocked jury to spur further deliberations by reminding them to be open to changing their minds in order to reach a verdict, if one can be reached without violating their individual judgment.  The instruction also suggests methods of refreshing deliberation, such as role-playing jurors holding opposite views.  (*Moore*, *supra*, 96 Cal.App.4th at pp. 1118-1119.)

such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict . . . ." [Citation.]' [Citation.]" (*Proctor*, at p. 539.)

Defendant first argues that the trial court gave the instruction without questioning the jury to ascertain whether there was a "reasonable probability" they could reach a verdict. There is no such requirement. A jury may not be *dismissed* unless the court finds there is no reasonable probability of a verdict. The trial court has discretion whether to allow deliberation to continue and need not inquire of the jury.

Defendant next asserts that the *Moore* charge improperly suggests that the jury must reach a verdict and that it pressured holdout jurors to defer to the majority. Defendant acknowledges the *Moore* instruction has been recognized as a proper charge to a jury reporting difficulties. (*People v. Whaley* (2007) 152 Cal.App.4th 968, 983; *People v. Hinton* (2004) 121 Cal App.4th 655, 661; *Parker v. Small* (9th Cir. 2011) 665 F.3d 1143, 1148.) He urges this court to follow the reasoning of Justice McAdams's concurrence in *Whaley*, which found the "'reverse role playing'" suggestion troubling and the overall instruction to create an expectation of a verdict. (*Whaley*, at p. 985) However, even Justice McAdams agreed that the effect was insufficient to reach a level requiring reversal. Here, on facts less troubling than the 11-1 split known to the trial judge in *Whaley*, we decline to find the instruction coercive.

D.     CUMULATIVE ERRORS

Defendant contends the cumulative effect of defense counsel's errors requires reversal of his conviction and sentence even if none of the errors is sufficient

29

individually.  We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

KING

Acting P. J.

CODRINGTON

J.